IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

GABRIELLA OROPESA,

Defendant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

———————————

BRIEF FOR THE UNITED STATES AS APPELLEE

———————————

GREGORY W. KEHOE
  United States Attorney
  United States Attorney's Office
  Middle District of Florida
  400 N. Tampa Street, Suite 3200
  Tampa, Florida 33602-4798
  (813) 274-6000

HARMEET K. DHILLON
  Assistant Attorney General
MICHAEL E. GATES
  Deputy Assistant Attorney General

JASON LEE
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1 through 26.1-3, the United States certifies that, in addition to those identified by defendant-appellant in her opening brief, the following persons may have an interest in the outcome of this case:

1. Dhillon, Harmeet K., U.S. Department of Justice, Civil Rights Division, counsel for the United States;

2. Gates, Michael E., U.S. Department of Justice, Civil Rights Division, counsel for the United States;

3. Lee, Jason, U.S. Department of Justice, Civil Rights Division, counsel for the United States.

The United States is not aware of any publicly traded corporations or companies that have an interest in the outcome of this case or appeal.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date: April 25, 2025

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that oral argument is unnecessary in this case, as the facts and legal arguments are adequately presented in the briefs and record, and the issues presented on appeal are straightforward.  However, the United States will appear for oral argument if this Court believes that argument would be helpful.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ............................. C-1

STATEMENT REGARDING ORAL ARGUMENT

SATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF THE ISSUES .............................................................. 1

STATEMENT OF THE CASE ................................................................. 2

    A.    Oropesa conspires to attack crisis pregnancy centers ............ 2

    B.    Oropesa is indicted and twice seeks to dismiss her
           Section 241 charge. ................................................................. 5

    C.    A jury convicts Oropesa and she unsuccessfully
           seeks to overturn the verdict. ................................................ 9

SUMMARY OF ARGUMENT ................................................................ 11

STANDARD OF REVIEW ..................................................................... 14

ARGUMENT

    I.    Section 241 applies to conspiracies to violate
         the rights secured in the FACE Act ..................................... 14

         A.    The FACE Act—a federal statute—is one of
             the "laws of the United States." ................................... 15

B.    Standards for determining private rights
of action under Section 1983 are irrelevant
to Section 241. ............................................................18

C.    The FACE Act would not displace
Section 241 enforcement even under
Section 1983's standards.............................................27

II.    The possibility of receiving different sentences
for different conduct cannot defeat Oropesa's
indictment. ...........................................................................33

A.    Congress may choose, and has here chosen,
to punish conspiracies more severely than
substantive offenses.....................................................34

B.    Neither *Fischer* nor *Snyder* alters the analysis. .........43

CONCLUSION ..........................................................................54

CERTIFICATE OF COMPLIANCE

# TABLE OF CITATIONS

**CASES:** PAGE

*Bondi v. VanDerStok*, 145 S. Ct. 857 (2025) ........................................... 44

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) ................................................................ 40-41

*Brown v. United States*, 602 U.S. 101 (2024) ........................................ 44

*Callanan v. United States*, 364 U.S. 587 (1961) .......................... 34, 36-38

*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) ........... 31-32

*Clune v. United States*, 159 U.S. 590 (1895) ..................................... 35-36

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ................. 2

*\*Fischer v. United States*,
603 U.S. 480 (2024) ............................ 2, 8, 13, 33, 43-46, 50-51, 53

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ..................................... 27, 30

*\*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
599 U.S. 166 (2023) ..................................................... 15, 17, 28-32

*Hubbard v. United States*, 514 U.S. 695 (1995) .................................... 19

*\*Iannelli v. United States*, 420 U.S. 770 (1975) .............. 25, 34-35, 38, 47

*Jeffers v. United States*, 432 U.S. 137 (1977) ........................................ 38

*Livadas v. Bradshaw*, 512 U.S. 107 (1994) ........................................... 28

*Middlesex Cnty. Sewerage Auth. v. National Sea Clammers Ass'n*,
453 U.S. 1 (1981) ....................................................................... 31-32

**CASES (continued):**                                                **PAGE**

*Muhammad v. Secretary, Dep't of Corr.*,
    554 F.3d 949 (11th Cir. 2009) ...................................... 17

*Pinkerton v. United States*, 328 U.S. 640 (1946) ................. 29, 35, 38, 47

*\*Snyder v. United States*,
    603 U.S. 1 (2024) ........................................... 2, 8, 13, 33, 47-49, 53

*Taggart v. Lorenzen*, 587 U.S. 554 (2019)............................... 42

*United States v. Andres*, 960 F.3d 1310 (11th Cir. 2020) ............... 14, 34

*United States v. Badolato*, 701 F.2d 915 (11th Cir. 1983)............... 36, 38

*United States v. Bowers*, 811 F.3d 412 (11th Cir. 2016)....................... 43

*United States v. DeLaurentis*, 491 F.2d 208 (2d Cir. 1974)............. 24, 26

*United States v. Evans*, 344 F.3d 1131 (11th Cir. 2003) ...................... 26

*United States v. Falcone*, 934 F.2d 1528 (11th Cir.),
    *reh'g granted and opinion vacated*,
    939 F.2d 1455 (11th Cir. 1991),
    *and opinion reinstated on reh'g*,
    960 F.2d 988 (11th Cir. 1992) (en banc) ....................................... 52

*United States v. Gallagher*,
    680 F. Supp. 3d 886 (M.D. Tenn. 2023) ........................................ 17

*United States v. Graham*, 123 F.4th 1197 (11th Cir. 2024) .................. 33

*United States v. Gresser*, 935 F.2d 96 (6th Cir. 1991) ........................... 42

*United States v. Guest*, 383 U.S. 745 (1966) ......................................... 16

**CASES (continued):** PAGE

*United States v. Handy*, Crim. No. 22-096,
2023 WL 4744057 (D.D.C. July 25, 2023) ...................................... 17

*United States v. Jimenez Recio*, 537 U.S. 270 (2003) ...................... 38, 49

\**United States v. Johnson*, 390 U.S. 563 (1968) .......................... 19-22, 26

*United States v. Kozminski*, 487 U.S. 931 (1988) .............................. 16-17

*United States v. Lee*, 935 F.2d 952 (8th Cir. 1991),
*vacated in part on reh'g,*
6 F.3d 1297 (8th Cir. 1993) (en banc) ............................................ 42

*United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010) ...................... 26

*United States v. Myers*, 892 F.2d 642 (7th Cir. 1990) ............................. 42

*United States v. Price*, 383 U.S. 787 (1966) ...................................... 16, 39

*United States v. Rabinowich*, 238 U.S. 78 (1915) ............................. 35, 37

*United States v. Sims*, 143 F. App'x 210 (11th Cir. 2005) ................ 22-23

*United States v. Stevens*, 909 F.2d 431 (11th Cir. 1990) ........................ 38

\**United States v. Stewart,*
65 F.3d 918 (11th Cir. 1995) ...................................... 19, 23, 26, 48

*United States v. Vineyard*, 945 F.3d 1164 (11th Cir. 2019) ................... 14

*United States v. Whitney*, 229 F.3d 1296 (10th Cir. 2000) .................... 23

*United States v. Williams*, 341 U.S. 70 (1951) ...................................... 38

*United States v. Wood*, 780 F.2d 955 (11th Cir. 1986) ..................... 23, 42

**CASES (continued):** PAGE

*United States v. Worthy*, 915 F.2d 1514 (11th Cir. 1990)................23, 42

**STATUTES:**

Civil Rigths Act of 1968
    18 U.S.C. 245................................................................42
    18 U.S.C. 245(b).............................................................42

Fair Housing Act
    42 U.S.C. 3631.......................................................22-23, 42

*Freedom of Access to Clinic Entrances Act
    18 U.S.C. 248..................................................................1
    18 U.S.C. 248(a)........................................................32, 40
    18 U.S.C. 248(a)(1) .............................................6, 27, 29, 41
    18 U.S.C. 248(a)(3) ........................................................41
    18 U.S.C. 248(b)........................................6-7, 25-26, 29, 32, 46, 50
    18 U.S.C. 248(b)(1)........................................................50
    18 U.S.C. 248(b)(2)........................................................50
    18 U.S.C. 248(c).......................................................25-26, 32
    18 U.S.C. 248(c)(1)........................................................27
    18 U.S.C. 248(c)(1)(A)......................................................7
    18 U.S.C. 248(d)(3) ................ 7, 19-21, 25, 27, 30, 32, 39-40, 43, 51
    18 U.S.C. 248(e)(1) .......................................................41
    18 U.S.C. 248(e)(5) .......................................................41

Ku Klux Klan Act
    42 U.S.C. 1983...........................................................15
    42 U.S.C. 1985(3)........................................................41

Sarbanes-Oxley Act
    18 U.S.C. 1515(c)(1)......................................................44
    18 U.S.C. 1515(c)(2)...................................................44-45

18 U.S.C. 2.....................................................................5

**STATUTES (continued):**         **PAGE**

*18 U.S.C. 241 ................................ 1, 5-6, 14, 16, 18, 29, 32, 46-48, 50, 52

18 U.S.C. 371 ...........................................................................25, 51-52

18 U.S.C. 666(a)(1)(B) ............................................................... 47

18 U.S.C. 1955 ........................................................................... 25

18 U.S.C. 3143(b)(1)(B) .............................................................. 11

18 U.S.C. 3231 ............................................................................. 1

28 U.S.C. 1291 ............................................................................. 1

Act of June 25, 1948, ch. 645, sec. 371, § 371, 62 Stat. 701 ...................51

**RULES:**

Fed. R. App. P. 4(b)(1)(A)(i) .......................................................... 1

Fed. R. App. P. 4(b)(3)(A) ............................................................. 1

Fed. R. Crim. P. 12(c)(3) .......................................................... 9, 33

Fed. R. Crim. P. 29(a) .................................................................. 10

**LEGISLATIVE HISTORY:**

Cong. Globe, 41st Cong., 2d Sess. (1870) .................................... 39

H.R. Rep. No. 304, 80th Cong., 1st Sess. (1947) ...............................52-53

H.R. Rep. No. 306, 103d Cong., 1st Sess. (1993) .................................. 42

S. Rep. No. 117, 103d Cong., 1st Sess. (1993).................................40-42

**MISCELLANEOUS:** PAGE

2 John Bouvier, *A Law Dictionary* (14th ed. 1871) ................................ 16

*Black's Law Dictionary* (1st ed. 1891)...................................................... 16

## STATEMENT OF JURISDICTION

Defendant-appellant Gabriella Oropesa (a/k/a "Gabs," a/k/a "Gaby," a/k/a "Gummy") appeals her judgment of conviction. The district court had jurisdiction under 18 U.S.C. 3231 and entered final judgment on March 18, 2025. Doc. 363.[1] Oropesa filed a timely Notice of Appeal on March 20, 2025. Doc. 365; Fed. R. App. P. 4(b)(1)(A)(i) and (3)(A). This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1. Whether the United States may prosecute Oropesa under 18 U.S.C. 241 for conspiring to violate the rights secured by the Freedom of Access to Clinic Entrances Act, 18 U.S.C. 248, a statute that includes civil and criminal remedies for completed offenses and states that these remedies are not exclusive.

2. Whether the rule that Congress may impose separate, and greater, penalties for conspiracy than for the completed offense survives

---

[1] "Doc. __, at __" refers to the docket entry and page number of documents filed in the district court, No. 8:23-cr-25 (M.D. Fla.). "Tr. __" refers to the page number of the transcript of Oropesa's sentencing hearing, C.A. Doc. 11-2. "Br. __" refers to the page number of the Appellant's Brief, C.A. Doc. 13. "Mot. __" refers to the page number of Oropesa's Motion for Release, C.A. Doc. 11-1.

the Supreme Court's decisions in *Fischer v. United States*, 603 U.S. 480 (2024), and *Snyder v. United States*, 603 U.S. 1 (2024), neither of which addresses Section 241 or the conspiracy/substantive-offense divide.

## STATEMENT OF THE CASE

### A.   Oropesa conspires to attack crisis pregnancy centers.

Oropesa's conviction arises from her conduct in the late spring and summer of 2022, during which she agreed with her co-conspirators to injure, oppress, threaten, or intimidate employees of reproductive health service facilities in the free exercise of the right to provide and seek to provide reproductive health services.  After the leak of the Supreme Court's draft opinion in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), Oropesa and her co-conspirators aligned themselves with an "extremist network known as 'Jane's Revenge.'"  Doc. 355, at 5 (¶ 9) (Presentence Report).  Jane's Revenge called for "autonomously organized self-defense networks" or "cells" to target pro-life pregnancy help centers with messages threatening that "if abortion isn't safe, you aren't either."  *Ibid.*; *see* Doc. 336-63 to 336-66.

Between May 28 and July 3, 2022, Oropesa and her co-conspirators agreed to vandalize pro-life pregnancy help centers in Florida with precisely the sort of threatening messages called for by Jane's Revenge.  Doc. 355, at 5-6 (¶¶ 10-13).  They decided to target reproductive health services facilities that provided and counseled alternatives to abortion.  *Id.* at 5 (¶ 10).  Over text message threads, the conspirators planned their attacks, "exchanged text messages about obtaining supplies for the vandalism," and checked which conspirators would be joining them.  *Id.* at 5-6 (¶¶ 11-12).

On May 28, 2022, Oropesa and her co-conspirators vandalized the Respect Life Pregnancy Help Center (RLPHC) in Hollywood, Florida.  Doc. 355, at 5 (¶ 11).  According to its website and evidence introduced at trial, RLPHC offers "life-affirming services to abortion-vulnerable families."  *Ibid.*  Arriving during the night and obscuring their identities with masks, hats, and gloves, Oropesa and her co-conspirators spray-painted threatening messages on the building, including "If abortions aren't SAFE Then niether [sic] are you," the Anarchist-A symbol, and "JANES REVENGE."  *Ibid.*

On June 26, 2022, Oropesa's co-conspirators vandalized the Life Choice Pregnancy Center (LCPC) in Winter Haven, Florida. Doc. 355, at 6 (¶ 12). LCPC is a non-profit reproductive health services facility that offers free "life-affirming" pregnancy support services, according to its website and evidence presented at trial. *Ibid.* Again arriving at night and obscuring their identities with masks, hats, and gloves, Oropesa's co-conspirators spray-painted threatening messages on the building, including "WE'RE COMING FOR U," "We are everywhere," the Anarchist-A symbol, "ABORTIONS 4 ALL," and "JANES REVENGE." *Ibid.*

On July 3, 2022, Oropesa and her co-conspirators vandalized the Pregnancy Help Medical Center (PHMC), also known as Heartbeat of Miami, in Hialeah, Florida. Doc. 355, at 6 (¶ 13). PHMC is a pro-life reproductive health services facility that offers free pregnancy testing, ultrasounds, and counseling. *Ibid.* Arriving in "the early morning hours" and with their identities again obscured with masks, hats, and gloves, Oropesa and her co-conspirators spray-painted threatening messages including "If abortions aren't safe the [sic] neither are you." *Ibid.*

Oropesa's conduct deeply affected employees and volunteers of the targeted reproductive health facilities. The clinics were forced to increase security after the conspirators' vandalism. *See* Tr. 20, 22, 24, 26. RLPHC, for instance, "installed video doorbells, panic buttons at the front desks and video cameras at [their] other centers," and "provided every employee with personal safety devices, mace and alarms for their key chains." Tr. 24. Every testifying victim "described feeling scared and intimidated." Doc. 357, at 4; *see* Tr. 20, 22, 24, 26-27. Each also testified about their fear "that the vulnerable communities that they served—largely underprivileged women in crisis—would be afraid to come and receive the services that the clinics provide." Doc. 357, at 4-5; *see, e.g.*, Tr. 24.

## B. Oropesa is indicted and twice seeks to dismiss her Section 241 charge.

1. The United States indicted Oropesa, along with three other defendants, on one count of conspiracy against rights in violation of 18 U.S.C. 241 and 2. Doc. 54, at 1-4. As relevant here, Section 241 provides that "[i]f two or more persons conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of

the United States, or because of his having so exercised the same," those responsible "shall be fined under this title or imprisoned not more than ten years, or both." 18 U.S.C. 241.

The Superseding Indictment in this case alleged that Oropesa violated Section 241 by conspiring to deprive clinic employees of the free exercise of their right "to provide and seek to provide reproductive health services" under the Freedom of Access to Clinic Entrances (FACE) Act. Doc. 54, at 1-2.[2] The FACE Act imposes criminal and civil penalties on anyone who,

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.

18 U.S.C. 248(a)(1).

First-time FACE Act offenders are subject to misdemeanor charges, while second and subsequent offenses constitute a felony. 18 U.S.C. 248(b). For any offense, "if bodily injury results," the offender

---

[2] The Superseding Indictment also included two counts against Oropesa's co-conspirators, brought under the FACE Act itself, for the attack on LCPC. Doc. 54, at 4-5.

may be imprisoned for up to ten years—and, "if death results," imprisonment is authorized "for any term of years or for life." *Ibid.* The Act also provides a private civil right of action to "[a]ny person aggrieved by reason of the conduct prohibited by" the Act, while limiting the right to enforce Section 248(a)(1) to "person[s] involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a facility that provides reproductive health services." 18 U.S.C. 248(c)(1)(A). However, the Act clarifies that "[n]othing in this section shall be construed . . . to provide exclusive criminal penalties or civil remedies with respect to the conduct prohibited by this section." 18 U.S.C. 248(d)(3).

2. Oropesa moved to dismiss the count against her. Doc. 102. She argued that Section 241 requires state action (*id.* at 4-9), that the FACE Act is not among the "laws of the United States" whose violation can lead to prosecution under Section 241 (*id.* at 9-13), and that the indictment was defective for other reasons (*id.* at 13).

The district court rejected these arguments and denied Oropesa's Motion to Dismiss. Doc. 144, at 1. As relevant here, the court held that the FACE Act creates a "right," interference with which can be a proper

subject of a Section 241 conspiracy. *Id.* at 8-12. The court then determined that the FACE Act's own criminal liability regime did not preclude the FACE Act from creating a "right" for Section 241 purposes or otherwise prevent the United States from prosecuting Oropesa and her co-conspirators under Section 241. *Id.* at 13-17. To the contrary, the fact that the FACE Act provides for civil and criminal liability *supported* the idea that the Act is a "law[] of the United States" that created a "right" enforceable under Section 241—as did the FACE Act's express statement that its remedies is non-exclusive. *Id.* at 14-16 (alteration in original). Likewise, the fact that a direct FACE Act charge would only subject a first-time offender like Oropesa to misdemeanor penalties did not prevent her from being subjected to a felony conspiracy prosecution under Section 241. *Id.* at 16-17.

3. The deadline for pretrial motions passed on November 30, 2023. Doc. 170. Eight months later, however, Oropesa filed a renewed Motion to Dismiss the charge against her. *See* Doc. 238. The Motion asserted that the Supreme Court's decisions in *Fischer v. United States*, 603 U.S. 480 (2024), and *Snyder v. United States*, 603 U.S. 1 (2024), "adopt a rule of statutory construction that requires courts, when

determining the meaning of terms in federal criminal statutes, to grant primary consideration to the risk of disparate punishments." Doc. 238, at 3. Oropesa therefore again asserted that she could not be prosecuted for a felony under Section 241 when the FACE Act itself would only subject her to a misdemeanor charge for a first offense. *Ibid.*

The district court denied the Motion. Doc. 249, at 1. Because the Motion was untimely, the court could only consider the Motion if Oropesa "show[ed] good cause." *Id.* at 4 (quoting Fed. R. Crim. P. 12(c)(3)). The court determined she had not done so (*id.* at 9), because neither *Fischer* nor *Snyder* applied to Oropesa's case (*id.* at 5). Neither decision announced any change in statutory interpretation principles; instead, both simply evaluated the scope of a particular criminal statute using typical interpretive tools. *Id.* at 5-8.

### C. A jury convicts Oropesa and she unsuccessfully seeks to overturn the verdict.

Oropesa's co-conspirators pleaded guilty to the Section 241 charge. Docs. 229-231. Two received sentences of 30 days each, while another received a felony prison sentence of one year and one day. Docs. 279-280, 283. Oropesa, however, chose to proceed to trial. After a three-day

trial in December 2024, the jury unanimously found Oropesa guilty of violating Section 241. Docs. 332, 335.

At the close of the defendant's evidence, Oropesa's counsel had moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). Doc. 330. The court reserved ruling and requested that Oropesa provide supplemental briefing. Doc. 339. Oropesa's written motion renewed most of the legal arguments from her pretrial Motions to Dismiss, while also arguing that the evidence was insufficient for a reasonable jury to convict her. Doc. 341, at 2-4. She also re-raised an evidentiary challenge that the court had rejected before trial. *Id.* at 5-6.

The court denied Oropesa's Motion. Doc. 354, at 1. It first noted that Oropesa's various legal arguments fell outside Rule 29's ambit, as they did not concern whether "the evidence was insufficient to sustain a conviction." *Id.* at 7 (citation omitted); *see ibid.* (stating that the arguments in Oropesa's Rule 29 Motion "do not at all address the evidence presented at trial"). The court then held that it had not abused its discretion in admitting the evidence about which Oropesa

complained, and that any error did not affect Oropesa's substantial rights. *Id.* at 8-10.

The district court sentenced Oropesa on March 13, 2025. Doc. 360. Oropesa made an oral motion for a downward variance at sentencing, which the court granted. Docs. 361-362. The court sentenced Oropesa to 120 days' imprisonment, followed by three years' supervised release. Doc. 363, at 2-3. The court denied two Motions for Release Pending Appeal, one at sentencing and one after Oropesa filed her Notice of Appeal. Doc. 367.

Oropesa filed another Motion for Release in this Court. C.A. Doc. 11. The United States opposed the Motion because Oropesa's appeal did not raise any "substantial issue of law or fact." 18 U.S.C. 3143(b)(1)(B); *see* C.A. Doc. 20. This Court denied Oropesa's Motion for Release. C.A. Doc. 22.

## SUMMARY OF ARGUMENT

1. The United States properly prosecuted Oropesa under Section 241 for conspiring to violate the rights secured by the FACE Act. The FACE Act is one of the "laws of the United States," a phrase that means precisely what it says. Oropesa contends that the FACE Act's remedial

scheme impliedly displaces Section 241, but the FACE Act expressly

declares its own remedies non-exclusive, and the Act certainly does not

provide the strong affirmative indication of exclusivity required to

foreclose prosecution under criminal conspiracy statutes.  Even under

the standards used to determine displacement of private civil suits—

which do not apply to Section 241—Oropesa's argument would fail.

Conspiracy prosecutions under Section 241 are a permissible

complement to the FACE Act's remedial scheme, and the FACE Act

provides an express indication that its remedies do not displace others.

2.  The supposed disparity between Section 241's maximum

sentence and the sentence to which Oropesa would have been subject

for a substantive FACE Act offense does not require displacement of the

Section 241 remedy.  Over a century of precedent recognizes that

Congress may punish conspiracies more harshly than the completed

substantive offense, because concerted criminal activity can pose

greater dangers than individual bad actors.  Section 241, passed to curb

the widespread threat of the Ku Klux Klan, was written with this exact

concern about conspiracies in mind.  And in passing the FACE Act,

Congress exhibited a clear desire to make available all available tools to

enable appropriate punishment of those denying access to reproductive care.

The Supreme Court's recent decisions in *Fischer v. United States*, 603 U.S. 480 (2024), and *Snyder v. United States*, 603 U.S. 1 (2024), did nothing to upset the longstanding distinction between conspiracies and substantive offenses. Each applied traditional canons of statutory interpretation to determine the meaning of ambiguous words in other criminal statutes. In both decisions, the Court found their textual readings of the statutes bolstered by inexplicable sentencing disparities that would have resulted had they read the statute the other way. But in neither case did this analysis drive the Court's result or cause the Court to change its reading of otherwise unambiguous language. And in both cases the alternative interpretation would have caused disparities between sentences for the *same* conduct, with no indication that Congress would have wanted to create such disparities. By contrast, Section 241 punishes *different* conduct than does the FACE Act—conduct that Congress often has punished more harshly—and the FACE Act itself expresses Congress's desire to allow such prosecutions. Oropesa's indictment was proper.

## STANDARD OF REVIEW

This Court "generally review[s] the district court's denial of a motion to dismiss an indictment under the abuse of discretion standard." *United States v. Vineyard*, 945 F.3d 1164, 1167 (11th Cir. 2019). But it reviews statutory interpretation questions *de novo*. *Id.* at 1168.

The court also "review[s] for abuse of discretion the denial" of a pretrial motion "on the grounds of timeliness." *United States v. Andres*, 960 F.3d 1310, 1315 (11th Cir. 2020). "[W]hen a party fails to establish good cause for an untimely motion under Federal Rule of Criminal Procedure 12, the issue in the motion is not preserved and [this Court's] review is limited to a plain error analysis." *Ibid.*

## ARGUMENT

## I.   Section 241 applies to conspiracies to violate the rights secured in the FACE Act.

On its face, Section 241 applies to all "laws of the United States" that secure personal rights. 18 U.S.C. 241. That includes the FACE Act. It does not matter that the FACE Act contains its own civil and criminal enforcement regimes. *Contra* Br. 10. For the FACE Act also declares that those civil and criminal remedies are not exclusive—

leaving Section 241 prosecutions intact.  Regardless, under the standards courts have applied both to Section 241 and to other criminal statutes, Congress is presumed to maintain the availability of conspiracy charges alongside charges for substantive offenses, unless a statute plainly says otherwise.

Even if this Court were to apply the standards used for private civil suits under Section 1983, as Oropesa advocates, the FACE Act does not impliedly displace Section 241 conspiracy prosecutions.  Section 241's conspiracy remedy is complementary to, not incompatible with, the FACE Act's remedial scheme, and Congress provided affirmative evidence that the FACE Act does not displace other civil or criminal remedies.  Under any standard, Oropesa's indictment was valid.

A.    **The FACE Act—a federal statute—is one of the "laws of the United States."**

Oropesa first argues that the FACE Act is not among the "laws of the United States" enforceable via Section 241.  Mot. 7-8.  To state this argument is to refute it.  "'Laws' means 'laws,' no less today than in the 1870s" when Congress passed Section 241.  *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 172 (2023) (discussing 42 U.S.C. 1983).  A "law" is simply "[a] rule or enactment promulgated by the

legislative authority of a state." 2 John Bouvier, *A Law Dictionary* 12 (14th ed. 1871); *accord Law*, *Black's Law Dictionary* (1st ed. 1891). "The language of § 241 is plain and unlimited. . . . [I]ts language embraces all of the rights and privileges secured to citizens by . . . all of the laws of the United States." *United States v. Price*, 383 U.S. 787, 800 (1966).

Hence, "when § 241 speaks of 'any right or privilege secured * * * by the Constitution or laws of the United States,' it means precisely that." *United States v. Guest*, 383 U.S. 745, 753 (1966) (alteration in original). In drafting Section 241, "Congress intended the statute to incorporate by reference a large body of potentially evolving federal law." *United States v. Kozminski*, 487 U.S. 931, 941 (1988). The district court thus rightly recognized that "[t]he FACE Act, a federal statute, is clearly a 'law[]' of the United States' for purposes of Section 241." Doc. 144, at 14 (second alteration in original) (quoting 18 U.S.C. 241).

To recognize that "laws" means laws does not mean that *any* federal statute can be enforced through Section 241 prosecutions. Not every statute secures a right within Section 241's meaning. *Contra* Br.

12.  Rather, the statute must "unambiguously confer[] individual rights," using "individual-centric language with an unmistakable focus on the benefitted class." *Talevski*, 599 U.S. at 183 (citation and internal quotation marks omitted) (discussing Section 1983).  And the right must be "made specific either by the express terms of the Federal . . . laws or by decisions interpreting them." *Kozminski*, 487 U.S. at 941.

That restriction poses no barrier in this case, as every court to address the issue has found that the FACE Act creates such a personal right.  *See United States v. Handy*, Crim. No. 22-096, 2023 WL 4744057, at \*3 (D.D.C. July 25, 2023); *United States v. Gallagher*, 680 F. Supp. 3d 886, 904 (M.D. Tenn. 2023); Doc. 144, at 59; *see also* Order at 4, *United States v. Vaughn*, No. 24-5615 (6th Cir. Nov. 14, 2024) (ruling on stay motion that "the FACE Act appears to create a right secured by 'laws of the United States,' and the government may prosecute Vaughn under Section 241 for conspiring to violate that right").  And Oropesa has repeatedly, affirmatively waived any argument "that the FACE Act fails to secure a right or privilege."  Br. 10; *see* Br. 11-12, 15-17; *Muhammad v. Secretary, Dep't of Corr.*, 554 F.3d 949, 957 (11th Cir. 2009) ("[W]aiver

is the intentional relinquishment or abandonment of a known right."
(alteration in original; citation omitted)).

All federal statutes, however—whether they create rights or not—
are "laws of the United States." 18 U.S.C. 241. Oropesa cannot
challenge her indictment or conviction by claiming that this
unambiguous phrase means something it does not.

**B.** **Standards for determining private rights of action
under Section 1983 are irrelevant to Section 241.**

Oropesa's argument, then, cannot find footing in Section 241's
text. Instead, she asserts that the FACE Act *impliedly* displaces
Section 241, because it contains an "enforcement regime that reflects
Congress's intent to preclude other remedies." Br. 12. For this claim,
Oropesa relies on case law analyzing whether statutory enforcement
regimes displace the presumptive availability of private civil suits
under Section 1983. *See* Br. 15-26. But as the district court recognized
(*see* Doc. 144, at 15), this is a different question from—and requires a
different analysis than—the question of whether the *government* can
still prosecute *criminal conspiracies* under Section 241.

1. It is a "well-established principle that Congress may
intentionally prescribe multiple punishments for the same conduct."

*United States v. Stewart*, 65 F.3d 918, 927 (11th Cir. 1995); *see Hubbard v. United States*, 514 U.S. 695, 715 n.14 (1995).  And the FACE Act authorizes exactly that.  After the subsections setting out the FACE Act's substantive covered conduct and its criminal and civil remedies, the Act states that "[n]othing in this section shall be construed . . . to provide exclusive criminal penalties or civil remedies with respect to the conduct prohibited by this section, or to preempt State or local laws that may provide such penalties or remedies."  18 U.S.C. 248(d)(3).

The Supreme Court held in *United States v. Johnson* that this sort of non-exclusivity provision offers strong evidence that Section 241 prosecutions remain viable.  390 U.S. 563, 566 (1968).  *Johnson* was a Section 241 case brought against "outside hoodlums" who "used violence" against three African-American men "for having received service at [a] restaurant."  *Id.* at 563-564.  The United States charged the defendants with "conspiracy to injure and intimidate" the victims "in the exercise of their right to patronize a restaurant," a right protected by Title II of the Civil Rights Act of 1964.  *Id.* at 564.  The district court dismissed the indictment because it believed that Section 207(b) of the Civil Rights Act—which declared injunctions to be the sole

remedy for enforcing Title II's rights—foreclosed a Section 241 remedy. *Ibid.* But the Supreme Court reversed, finding that Section 241 remained available. *Id.* at 567.

Crucial to the Court's decision was that, while Section 207(b) did declare injunctions to be the sole remedy for violation of Title II rights, that same subsection *also* preserved all rights and remedies "based on any other Federal or State law not inconsistent with this title." *Johnson*, 390 U.S. at 566. The Court found that there was thus "within the four corners of § 207(b) evidence that it was not designed as preempting every other mode of protecting a federal 'right.'" *Ibid.*[3] As a result, the Court read Section 207(b)'s injunctive-remedies-only language narrowly and held that the statute's non-exclusivity provision carried the day. *Id.* at 566-567. The FACE Act's non-exclusivity provision, which preserves *all* other "criminal penalties or civil remedies with respect to the conduct prohibited by this section," 18

---

[3] Thus, there *is* Supreme Court "authority resolving the question of whether and if so, in what circumstances § 241 may be used to enforce another federal statute." *Contra* Br. 18.

U.S.C. 248(d)(3), provides even stronger evidence here that Section 241 prosecutions are proper.

2. With or without such an explicit non-exclusivity provision, the mere existence of other civil or criminal remedies in a rights-securing statute has never been held to prohibit a Section 241 charge.

a. The Supreme Court has only ever precluded a Section 241 prosecution when—and only to the extent that—the statute securing the pertinent federal-law "right" for Section 241 purposes has already explicitly declared another remedy to be exclusive. Again, in *Johnson*, Title II *both* declared injunctions its exclusive remedy *and* disclaimed any displacement of consistent remedies from other statutes. The Court therefore also examined the effect of the injunction-as-exclusive-remedy provision on the government's ability to bring Section 241 prosecutions. *Johnson*, 390 U.S. at 567. The Court narrowly construed this exclusive-remedy language, reasoning that it "was inserted only to make clear that the substantive rights to public accommodation defined in" Title II "are to be enforced exclusively by injunction." *Ibid.* The exclusivity provision was thus strong enough to displace Section 241 prosecutions for the *owners and proprietors* of public accommodations. *See ibid.*

But the Court refused to displace Section 241's application one jot beyond the set of defendants against whom Title II had clearly limited relief.  It noted that "the Act does not purport to deal with outsiders" who interfere with equal provision of accommodations.  *Johnson*, 390 U.S. at 567.  "[N]or," it said, "can we imagine that Congress desired to give them a brand new immunity from prosecution under 18 U.S.C. § 241."  *Ibid.*  Because the exclusive-remedy provision did not clearly cover the "outside hoodlums," *id.* at 563, 567, the Court held that Section 241 remained available against them, *id.* at 567.  The analysis in *Johnson* thus leaves only the narrowest space for displacement of Section 241 charges:  The rights-securing statute must clearly exclude other remedies to oust Section 241; and, even then, that exclusion should be strictly construed.

b.  This Court, likewise, has allowed Section 241 prosecutions for conspiring to violate rights even when the statutes creating those rights contain their own remedial schemes.  It has never questioned, for example, that defendants can be convicted under Section 241 for conspiring to violate the housing rights created by the criminal provision of the Fair Housing Act, 42 U.S.C. 3631.  *See United States v.*

*Sims*, 143 F. App'x 210, 211 (11th Cir. 2005); *Stewart*, 65 F.3d at 921-922; *United States v. Worthy*, 915 F.2d 1514, 1515-1516 & n.2 (11th Cir. 1990); *United States v. Wood*, 780 F.2d 955, 959, 963 (11th Cir. 1986); *see also, e.g.*, *United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000).

To the contrary: This Court has held that "defendants can be convicted and punished both under § 241 for a conspiracy to violate . . . civil rights and under § 3631 for the actual threat to the victims' right to remain in their domicile regardless of their race." *Stewart*, 65 F.3d at 927 (rejecting double jeopardy challenge). Given the settled norm that substantive crimes and conspiracies are separate offenses, this Court stated that Congress must provide evidence "inconsistent" with that bedrock rule to override it. *Ibid.* (citation omitted). And this Court determined that "[n]either § 241 nor § 3631 contains an 'inconsistent expression' indicating a Congressional intent to bar the simultaneous application of the two provisions." *Ibid.* This even though Section 3631 itself is a criminal provision that provides escalating penalties based on the severity of the defendant's conduct, *see* 42 U.S.C. 3631, and served

as one of Congress's principal models for the FACE Act's criminal penalty regime, *see* pp. 41-42, *infra*.

Indeed, if anything, it is Congress's decision to provide *no* civil or criminal remedies for violating a federal right—not its decision to provide such remedies—that indicates that Congress wished to exempt violators from Section 241 prosecutions. *See United States v. DeLaurentis*, 491 F.2d 208, 213 (2d Cir. 1974). The Second Circuit in *DeLaurentis* dismissed a Section 241 case that charged a conspiracy to violate the labor rights created by a provision of the Taft-Hartley amendments to the National Labor Relations Act. *Id.* at 211, 214. In crafting the Taft-Hartley Act, Congress had purposely avoided criminal penalties for violating the new right "not to join in concerted union activities." *Id.* at 212-213. Congress also decided to *remove* the statute's civil damages remedy from the House bill before passage. *Id.* at 213. Congress's determination to refrain from providing *any* civil or criminal penalties in the law creating the underlying right provided evidence that Congress intended to preclude a Section 241 prosecution for violating that right. *Ibid.* Congress took the opposite approach

here, including a panoply of non-exclusive civil and criminal remedies. *See* 18 U.S.C. 248(b)-(c) and (d)(3).

c.  Even beyond Section 241, courts generally have expressed reluctance to infer that one statute's remedies for substantive violations displace the use of separate conspiracy statutes.  In *Iannelli v. United States*, 420 U.S. 770 (1975), for instance, the Supreme Court held that the provisions of a federal illegal gambling statute, 18 U.S.C. 1955, did not preclude a prosecution for conspiring to violate Section 1955 under 18 U.S.C. 371, the general statute prohibiting conspiracies against the United States.  *See Iannelli*, 420 U.S. at 791.  "The historical difference between the conspiracy and its end," the Court noted, created a presumption "in the absence of any inconsistent expression" that Congress does not intend to displace the possibility of conspiracy prosecutions when it creates statutes with substantive criminal offenses.  *Id.* at 779.  The Court therefore reasoned that, "[h]ad Congress intended to foreclose the possibility of prosecuting conspiracy offenses under § 371 by merging them into prosecutions under § 1955, . . . it would have so indicated explicitly."  *Id.* at 789.

This Court, following the same reasoning, has refused to read into various substantive statutes an intent to foreclose prosecutions for conspiracy to commit the same offense under Section 371. *See United States v. McNair*, 605 F.3d 1152, 1216 (11th Cir. 2010); *United States v. Evans*, 344 F.3d 1131, 1133 & n.2 (11th Cir. 2003). *Iannelli*'s rationale also underlay this Court's decision in *Stewart* that Section 241 can be used to charge conspiracies to violate the Fair Housing Act. *See Stewart*, 65 F.3d at 927.

d.  Under these standards, Section 241 plainly is an available remedy for conspiracies to violate FACE Act rights. The FACE Act provides civil and criminal remedies, indicating a congressional intent to permit significant sanctions for violating the rights the Act creates. *See* 18 U.S.C. 248(b)-(c); *cf. DeLaurentis*, 491 F.2d at 213. And the Act contains no express limitations on relief for the conspiracy conduct Section 241 reaches. *See* 18 U.S.C. 248(b)-(c); *cf. Johnson*, 390 U.S. at 567. "If Congress had intended to foreclose prosecuting § [241] conspiracy offenses in [FACE Act] crimes, it could have said so or merged the offenses." *McNair*, 605 F.3d at 1216. But it did not. To the contrary:  As described above, Congress expressly stated that the FACE

Act's remedies are *not* exclusive.  *See* 18 U.S.C. 248(d)(3).  The

argument for displacing Section 241's remedy therefore cannot survive

contact with the FACE Act's text.

### C.    The FACE Act would not displace Section 241 enforcement even under Section 1983's standards.

Section 241 case law has never followed or adopted the standards

used in Section 1983 cases to analyze whether a statutory enforcement

regime displaces a private civil remedy.[4]  Even if the Court were to

apply Section 1983's standards, however, the same result would obtain.

A federal statute is "presumptively enforceable" under Section 1983 if it

"unambiguously confer[s]" individual federal rights.  *Gonzaga Univ. v.

Doe*, 536 U.S. 273, 283-284 (2002).  Oropesa has conceded that the

FACE Act creates a personal right to provide or seek to provide

reproductive health services free of injury, intimidation, or interference.

Br. 10; *see* 18 U.S.C. 248(a)(1) and (c)(1).  And Oropesa cannot rebut

---

[4]  Though the United States has argued that Section 1983 cases could be useful analogues on the antecedent question of whether the substantive statute secures a personal right (*see* Doc. 108, at 7), it consistently has rejected the idea that Section 1983 cases can be used to determine the later question of whether a statute impliedly displaces Section 241 remedies (*see* Doc. 138, at 2).

such a presumption that the FACE Act right at issue here may be enforced via Section 241.

1. If a federal statute creates a personal right, it becomes the defendant's "burden" to "'defeat t[he] presumption [of enforceability] by demonstrating that Congress did not intend' that § 1983 be available to enforce" that right. *Talevski*, 599 U.S. at 186 & n.13 (first alteration in original; citation omitted). Absent an express statutory prohibition on Section 1983 suits, "a defendant must show that Congress issued the same command implicitly." *Id.* at 186.

It is only in the "exceptional case[]," however, that a statute's enforcement scheme impliedly displaces Section 1983. *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994). "[T]he *sine qua non* of" an implied displacement "is incompatibility between enforcement under § 1983 and the enforcement scheme that Congress has enacted." *Talevski*, 599 U.S. at 187. Incompatibility is a strict standard. The defendant must prove, via "the application of ordinary interpretive tools," that "Congress intended [that] statute's remedial scheme to be the 'exclusive avenue through which a plaintiff may assert [his] claims.'" *Id.* at 189 (alterations in original; citation omitted). A defendant cannot prove

that a rights-creating statute impliedly displaces Section 1983 if the statute's "remedial scheme could 'complement,' not 'supplant, § 1983.'" *Id.* at 190 (citation omitted).

Such is the case here. Section 241 provides a criminal remedy for conspiring to violate the rights the FACE Act protects. *See* 18 U.S.C. 241. This remedy covers a different offense from, and thus provides a complement to, the FACE Act's own remedies for completed FACE Act violations. *See* 18 U.S.C. 248(a)(1) and (b). "[T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses," which Congress may "separate" into different provisions and punish separately. *Pinkerton v. United States*, 328 U.S. 640, 643 (1946).

It therefore does not matter that the FACE Act contains its own civil and criminal penalties for substantive violations. "The attendant presumption" in the Section 1983 context "is that § 1983 can play its textually prescribed role as a vehicle for enforcing" a statute's "rights, *even alongside a detailed enforcement regime that also protects those interests*, so long as § 1983 enforcement is not incompatible with Congress's handiwork." *Talevski*, 599 U.S. at 188-189 (emphasis added;

citation and internal quotation marks omitted).  Section 241 enforcement is perfectly compatible with the FACE Act's own remedies.

2.  In any event, Congress indicated "expressly, through 'specific evidence from the statute itself,'" that the FACE Act's remedies should not displace others.  *Gonzaga Univ.*, 536 U.S. at 284 n.4 (citation omitted).  This includes Section 241's criminal prohibition on conspiring against rights.  The FACE Act's non-exclusivity provision declares that "[n]othing in this section shall be construed . . . to provide exclusive criminal penalties or civil remedies with respect to the conduct prohibited by this section."  18 U.S.C. 248(d)(3).

Thus, far from indicating "that permitting § [241] to operate would 'thwar[t] Congress' intent' in crafting the" FACE Act, as would be required to displace remedies in the Section 1983 context, "the language of the Act confirms otherwise."  *Talevski*, 599 U.S. at 191 (second alteration in original; citation omitted).  Indeed, the FACE Act is on all fours with the statute found to be enforceable under Section 1983 in *Talevski*.  That statute's savings clause—which the Court found supported Section 1983 enforceability—said that "'[t]he remedies provided under' its enforcement-process subsection are 'in addition to

those otherwise available under State or Federal law and shall not be construed as limiting such other remedies.'" *Ibid.* (alteration in original; emphasis and citation omitted).

Oropesa points instead (Br. 24-25) to *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981), and *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), older cases that found statutory enforcement regimes to displace Section 1983 despite containing savings clauses. But as *Talevski* noted, those clauses "were embedded in statutes that . . . contained private judicial rights of action." *Talevski*, 599 U.S. at 189, 191 n.14. Those statute-specific rights of action were thus incompatible with private civil enforcement via Section 1983: They covered the exact same conduct for which Section 1983 suits would provide a remedy, while imposing more procedural hurdles and providing "fewer benefits" than Section 1983. *Id.* at 189.

The savings clauses alone, therefore, could not overcome the strong indications in the rest of each statute that Congress wanted plaintiffs to employ only their statute-specific processes, to the exclusion of Section 1983. By contrast, the FACE Act's civil and

criminal remedies do not reach the conspiracy conduct for which Section 241 provides a separate remedy. *See* 18 U.S.C. 248(a)-(c). And the Act's criminal provision imposes no greater procedural barriers than does Section 241. *Compare* 18 U.S.C. 241, *with* 18 U.S.C. 248(b). The two are thus complementary.

More importantly, *Talevski* distinguished those other savings clauses because they "did not purport to preserve 'other remedies.'" 599 U.S. at 191 n.14. Instead, they merely preserved "any *right* which any person . . . may have under any statute or common law or to seek . . . any other relief," *National Sea Clammers Ass'n*, 453 U.S. at 20 n.31 (emphasis added; alterations in original), or else provided that the statute "shall not be construed to modify, impair, or supersede Federal, State, or local law," *City of Rancho Palos Verdes*, 544 U.S. at 126 (citation omitted). In *Talevski*, by contrast, the "explicitly expressed objective of preserving *other remedies* bolster[ed] [the Court's] reluctance to infer implicit displacement of the § 1983 remedy." *Talevski*, 599 U.S. at 191 n.14 (emphasis added). The same holds here. Like the statute in *Talevski*, the FACE Act expressly preserves all other "criminal penalties or civil remedies," 18 U.S.C. 248(d)(3), which

naturally encompass the penalties in Section 241. Absent mentioning

Section 241 by name, it is difficult to find language better crafted to

warn courts *not* to read a statute as impliedly displacing Section 241.

## II. The possibility of receiving different sentences for different conduct cannot defeat Oropesa's indictment.

Alternatively, Oropesa asserts that the FACE Act cannot form the

basis of a Section 241 charge because the latter permits up to a ten-year

maximum sentence while a first-time violation of the former is a

misdemeanor. Br. 26-40. She is wrong. "[A] substantive offense and a

conspiracy to commit that offense are separate and distinct crimes,"

*United States v. Graham*, 123 F.4th 1197, 1238 (11th Cir. 2024), and

Congress is free to punish a conspiracy to violate rights more harshly

than a substantive FACE Act offense.

Oropesa asserted otherwise in a renewed Motion to Dismiss her

indictment. Doc. 249, at 3-4. But this Motion was untimely, and hence

would be deemed forfeited, unless she could provide "good cause" for her

delay. Fed. R. Crim. P. 12(c)(3); Doc. 249, at 6. The only cause Oropesa

provided was the supposedly intervening authority of *Fischer v. United

States*, 603 U.S. 480 (2024), and *Snyder v. United States*, 603 U.S. 1

(2024). Doc. 249, at 6. Neither case, however, so fundamentally

changed the rules of statutory interpretation that they require a different result. To the contrary: As the district court correctly noted, "neither *Fischer* nor *Snyder* [is] applicable to Oropesa's case." *Id.* at 5. Hence, Oropesa's claim is forfeited. *See United States v. Andres*, 960 F.3d 1310, 1315 (11th Cir. 2020). And, under plain-error review, *ibid.*, "the district court did not abuse its discretion in denying the motion as untimely," *id.* at 1316; *contra* Br. 40.

## A. Congress may choose, and has here chosen, to punish conspiracies more severely than substantive offenses.

Oropesa's sentencing-disparity argument flows from a single basic premise: that it is somehow unfair, or even unlawful, to bring a felony conspiracy charge when the completed offense would only merit a misdemeanor. *See* Br. 30. But there is nothing untoward about this.

1. "The distinctiveness between a substantive offense and a conspiracy to commit is a postulate of our law." *Callanan v. United States*, 364 U.S. 587, 593 (1961). Unlike a substantive violation, a "[c]onspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975). Because conspiring to achieve an illegal end and ultimately achieving that end constitute separate crimes, no principle of

statutory interpretation requires courts to read substantive criminal provisions as impliedly prohibiting the application of a separate conspiracy charge. "The power of Congress to separate the two and to affix to each a different penalty is well established." *Pinkerton v. United States*, 328 U.S. 640, 643 (1946).

The penalty attached to the conspiracy violation need not be tethered to the penalty for the substantive offense the conspirator agrees to commit. The Supreme Court has consistently "held that the conspiracy can be punished more harshly than the accomplishment of its purpose." *Iannelli*, 420 U.S. at 778; *see United States v. Rabinowich*, 238 U.S. 78, 88 (1915); *Clune v. United States*, 159 U.S. 590, 595 (1895). "Whatever may be thought of the wisdom or propriety of a statute making a conspiracy to do an act punishable more severely than the doing of the act itself, it is a matter to be considered solely by the legislative body." *Clune*, 159 U.S. at 595.

This rule holds when the harsher conspiracy punishment appears in a separate statute, as well as when it appears in the statute creating the substantive offense. In *Clune*, for instance, the Supreme Court rejected an argument that the government could not prosecute a

defendant for conspiracy against the United States because that conspiracy offense carried a $1,000 to $10,000 fine and up to two years' imprisonment while the underlying substantive offense, obstructing passage of the mails, appeared in a separate statute and was only punishable by a $100 fine. 159 U.S. at 594-595. Contrary to the entire thrust of Oropesa's argument, then, it is perfectly acceptable for Congress to punish a substantive, first-time FACE Act offense as a misdemeanor while Section 241 separately punishes as a felony a conspiracy to violate the rights the FACE Act creates.

Congress has good reasons for punishing conspiracies more harshly, in certain cases, than substantive offenses. Unlike substantive criminal laws, "[c]onspiracy laws are designed to protect society from the dangers of *concerted* criminal activity." *United States v. Badolato*, 701 F.2d 915, 921 (11th Cir. 1983) (emphasis added). Such "collective criminal agreement—partnership in crime—presents" unique threats. *Callanan*, 364 U.S. at 593. For one thing, it "often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish." *Ibid.* Here, for instance, the combination of conspiring co-defendants enabled them to attack three

reproductive health facilities, while Oropesa herself was only alleged to have participated in two of these incidents. Doc. 355, at 5-6 (¶¶ 10-13). A conspiracy also is "characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered." *Rabinowich*, 238 U.S. at 88. In this case, for instance, two of Oropesa's co-defendants were arrested first and had their cellphones seized; they then attempted to warn Oropesa and her other co-conspirators, telling them to remove the arrested conspirators from their cellphone group chats because the chats were "compromised." Doc. 355, at 6 (¶ 14).

Conspiracies also pose dangers beyond the particular substantive offenses the defendants first agree to commit. A conspiracy "involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices." *Rabinowich*, 238 U.S. at 88. Forming a conspiracy also "makes more likely the commission of crimes unrelated to the original purpose for which the group was formed," so that "the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise." *Callanan*, 364 U.S. at 593-594.

Conspiracies thus can pose "a 'threat to the public' over and above the threat of the commission of the relevant substantive crime—both because the '[c]ombination in crime makes more likely the commission of [other] crimes' and because it 'decreases the probability that the individuals involved will depart from their path of criminality.'" *United States v. Jimenez Recio*, 537 U.S. 270, 275 (2003) (alterations in original) (quoting *Callanan*, 364 U.S. at 593-594). The Supreme Court and this Court have consistently affirmed as much. *See, e.g., ibid.*; *Jeffers v. United States*, 432 U.S. 137, 157 (1977); *Iannelli*, 420 U.S. at 778; *Callanan*, 364 U.S. at 593-594; *Pinkerton*, 328 U.S. at 643; *United States v. Stevens*, 909 F.2d 431, 433 (11th Cir. 1990); *Badolato*, 701 F.2d at 921.

Congress enacted Section 241 based on just such concerns. It passed the Enforcement Act of 1870, of which Section 241 was a part, to curb "the lawless activities of private bands, of which the Klan was the most conspicuous." *United States v. Williams*, 341 U.S. 70, 76 (1951) (plurality opinion). Section 241's author, Senator John Pool of North Carolina, drafted and advocated for the provision precisely because of the unique danger posed by these large bands of conspirators. He

warned that "[n]ot only citizens, but *organizations of citizens, conspiracies*, may be and are, as we are told, in some of the States formed for th[e] purpose" of violating federal rights. Cong. Globe, 41st Cong., 2d Sess. 3611 (1870) (emphasis added). While other sections of the bill already prohibited rights violations by individuals, Senator Pool argued that "any bill will be defective which does not make it a *highly penal offense* for men to *conspire together*, to organize themselves into bodies, for the express purpose of contravening" such important rights. *Ibid.* (emphasis added). Thus, "history leaves no doubt that, if we are to give § 241 the scope that its origins dictate, we must accord it a sweep as broad as its language" and apply it to all federal rights for which Congress did not clearly exclude its usage. *United States v. Price*, 383 U.S. 787, 801 (1966).

2. On the other side of the equation, the FACE Act contains no indication that a separate conspiracy charge should be foreclosed simply because it could lead to a more severe punishment. *See* Part I.B, *supra*. To the contrary, the FACE Act expressly provides that its remedies are not exclusive. *See* 18 U.S.C. 248(d)(3). This provision would preserve Section 241's remedies even if Section 241 prohibited the same "conduct

prohibited by [the FACE Act]." *Ibid.* But the Court need not even look that far, for the FACE Act contains no conspiracy prohibition of its own. *See* 18 U.S.C. 248(a). Congress thereby preserved the possibility of prosecuting under Section 241 a conspiracy to violate rights secured by the FACE Act, including in some instances by punishing such conduct more harshly than what a substantive FACE Act offense might permit.

Oropesa's only response is to suggest that Congress made "a deliberate legislative choice" to leave conspiracy liability out of the FACE Act and so to punish "only substantive, not inchoate, crimes." Br. 38. Oropesa offers this assertion with no authority or basis in the legislative record. Such a bald supposition cannot defeat the rule that Congress may punish conspiracies separately—including in separate statutes—and that only an affirmative indication from the substantive statute can rebut this presumption. *See* pp. 18-26, 34-38, *supra*.

In any event, there is no indication that Congress made a deliberate choice to foreclose conspiracies to violate the FACE Act. Quite the opposite. Congress passed the FACE Act to "fill the gap in the law" created by the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993). *See* S. Rep. No. 117, 103d

Cong., 1st Sess. 19 (1993) (Senate Report). *Bray* held that the civil

conspiracy provision of the Ku Klux Klan Act, 42 U.S.C. 1985(3), did not

reach a conspiracy to violate the then-extant constitutional right to

abortion by obstructing access to abortion clinics. 506 U.S. at 278.

Congress lamented that *Bray* overturned various other decisions

that *had* allowed civil suits under Section 1985(3) for conspiracies to

disrupt access to reproductive care. Senate Report 18. And it lamented

further that state and local criminal laws were inadequate to solve the

problem, in part because "the penalties for violations of these laws are

often so low as to provide little if any deterrent effect." *Id.* at 19-20.

Given these twin concerns, Congress would not have wished to *preclude*

conspiracy prosecutions that may in certain circumstances provide

greater penalties than the FACE Act.[5]

Moreover, Congress modeled the FACE Act's criminal penalty

scheme on the penalty regimes of two other criminal statutes: the

---

[5] The FACE Act does not protect only the provision of
reproductive services in abortion clinics; rather it applies to all
"reproductive health services," 18 U.S.C. 248(a)(1) and (3), including
services provided by the type of facilities vandalized by Oropesa and her
co-conspirators, *see* 18 U.S.C. 248(e)(1) and (5).

provision of the Civil Rights Act of 1968 prohibiting interference with federally protected activities, 18 U.S.C. 245, and the criminal provision of the Fair Housing Act, 42 U.S.C. 3631. *See* H.R. Rep. No. 306, 103d Cong., 1st Sess. 13 n.21 (1993); Senate Report 25. Neither of those statutes prohibits conspiracies. *See* 18 U.S.C. 245(b); 42 U.S.C. 3631. Indeed, by the time Congress drafted the FACE Act, courts had already *allowed* many prosecutions under Section 241 for conspiring to violate the right to enjoy a dwelling free of racial violence that Section 3631 created.[6]

In light of the FACE Act's use of Section 3631 as a model, Congress would have had to affirmatively express a desire to break from preexisting case law and foreclose Section 241 prosecutions for conspiring to interfere with FACE Act rights. *Cf. Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is obviously transplanted from another legal source, it brings the old soil with it."

---

[6] *See, e.g.*, *United States v. Lee*, 935 F.2d 952, 955 (8th Cir. 1991), *vacated in part on reh'g*, 6 F.3d 1297 (8th Cir. 1993) (en banc); *United States v. Gresser*, 935 F.2d 96, 103 (6th Cir. 1991); *United States v. Worthy*, 915 F.2d 1514, 1516 & n.2 (11th Cir. 1990); *United States v. Myers*, 892 F.2d 642, 643 (7th Cir. 1990); *United States v. Wood*, 780 F.2d 955, 959, 963 (11th Cir. 1986).

(citation and internal quotation marks omitted)).  Yet instead, Congress

expressly *disclaimed* any intent to displace other criminal penalties.

*See* 18 U.S.C. 248(d)(3).  Congress's failure to include a conspiracy

provision in the FACE Act itself, then, poses no barrier to bringing a

Section 241 conspiracy prosecution that could subject the defendant to a

potentially higher penalty for that separate offense.

## B.    Neither *Fischer* nor *Snyder* alters the analysis.

Oropesa asserts that *Fischer* and *Snyder* constitute intervening

authority that both justify her untimely Motion to Dismiss and entitle

her to dismissal.  *See* Br. 26-28, 40; Doc. 249, at 6.  Neither case,

however, changes anything about the statutory interpretation analysis

already related above.  So "the district court did not commit error, much

less plain error, in denying [Oropesa's] motion" as without good cause.

*United States v. Bowers*, 811 F.3d 412, 424 (11th Cir. 2016).

1.  Oropesa first asserts that, in *Fischer*, 603 U.S. 480, the

Supreme Court adopted an entirely new "rule that ambiguities in

statutory language must be resolved in a way that results in the less

severe penalty."  Br. 31.  Far from it.  What Oropesa appears to posit is

a stronger, sentencing-specific version of the rule of lenity, which reads

ambiguous laws in favor of the criminal defendant. But lenity does not apply whenever a statute raises an ambiguity, as Oropesa suggests; rather, it "applies only if a statute remains grievously ambiguous after we have consulted everything from which aid can be derived." *Brown v. United States*, 602 U.S. 101, 122 (2024) (citation and internal quotation marks omitted). And Oropesa has pointed to no language in either the FACE Act itself or Section 241 that can be labeled ambiguous, much less grievously ambiguous. The Court did not adopt a new conception of lenity in *Fischer*. *See, e.g.*, *Bondi v. VanDerStok*, 145 S. Ct. 857, 876 (2025) (holding, after *Fischer*, that lenity still has no "role to play where 'text, context, and structure' decide the case" (citation omitted)). Much less did the Court announce a rule that would require the government to charge only the least-serious offense for any given set of conduct to avoid sentencing disparities.

Rather, *Fischer* involved a garden-variety application of various semantic canons of statutory interpretation. In *Fischer*, the Court interpreted "the residual 'otherwise' clause in" a criminal provision of the Sarbanes-Oxley Act, 18 U.S.C. 1515(c)(2). 603 U.S. at 485. Because the preceding provision, 18 U.S.C. 1515(c)(1), already prohibited certain

obstructive acts, the Court had to "defin[e] what exactly Congress left for (c)(2)," *Fischer*, 603 U.S. at 487. The Court employed the "general principles" of *noscitur a sociis* (*i.e.*, a thing is known by its neighbors) and *ejusdem generis* (*i.e.*, a general provision at the end of a list must be read in light of the specific examples preceding it). *Ibid.* Applying these longstanding canons, the Court held that the scope of the residual clause in 18 U.S.C. 1515(c)(2) must be "limited by the preceding list of criminal violations" in Subsection (c)(1). *Id.* at 487, 489.

After this analysis, the Court applied another venerable semantic canon: the rule against surplusage. *See Fischer*, 603 U.S. at 486, 489-490, 496. It noted that "[f]ederal obstruction law consists of numerous provisions that target specific criminal acts and settings," and that "[m]uch of that particularized legislation would be unnecessary if (c)(2) criminalized essentially all obstructive conduct, as the Government contend[ed]." *Id.* at 492. The Court also reasoned that "[a]n unbounded interpretation of [the residual clause] would also render superfluous the careful delineation of different types of obstructive conduct in Section 1512 itself." *Id.* at 493. *Fischer* thus focused on the unlikelihood that Congress would have intended an ambiguous residual clause to cover—

and to provide a different maximum sentence for—the same conduct that Congress already had addressed in both the same statute and other parts of the Criminal Code.  *See id.* at 493-494.

But *Fischer* "did not revolutionize the way courts must evaluate criminal liability altogether."  Doc. 249, at 7.  Rather, it employed traditional canons of interpretation in traditional ways.  And its analysis simply does not apply here, because Section 241 reaches *different* conduct from the FACE Act:  conspiracies to violate federal rights.  18 U.S.C. 241.  Section 241 reaches this conduct clearly, in a *different* statute, rather than in an ambiguous catchall provision of the FACE Act itself.

It is perfectly viable, then, to "give meaning where possible to each word and provision in the Code," *Fischer*, 603 U.S. at 493, by reading Section 241 and the FACE Act each to carry their natural meaning. The FACE Act unambiguously imposes an escalating set of penalties for the substantive offense of obstructing or interfering with reproductive health facilities, *see* 18 U.S.C. 248(b), while Section 241 unambiguously provides up to a ten-year maximum penalty for the inchoate offense of "conspir[ing]" to violate the "right" to provide or receive reproductive

health services, 18 U.S.C. 241. Congress is perfectly entitled "to separate" substantive and conspiracy offenses, as it did here, and "affix to each a different penalty," *Pinkerton*, 328 U.S. at 643, even if the maximum punishment for conspiracy is greater, *see Iannelli*, 420 U.S. at 778. *Fischer* does not say otherwise.

2. *Snyder* is even further afield. There, the Court asked whether the federal bribery statute—specifically, 18 U.S.C. 666(a)(1)(B)— "makes it a federal crime for state and local officials to accept gratuities for their past official acts." *Snyder*, 603 U.S. at 10. The Court determined that "[s]ix reasons, taken together," indicate "that § 666 is a bribery statute and not a gratuities statute." *Ibid.*

Oropesa focuses on only one of these six reasons (*see* Br. 35), even though the Court itself did not consider any one of them capable of deciding that case on its own (*see Snyder*, 603 U.S. at 10). This necessary-but-insufficient factor was what Oropesa calls "the matter of unacceptably disparate 'statutory punishments.'" Br. 35 (quoting *Snyder*, 603 U.S. at 13). Were the bribery statute to reach gratuities, the Court reasoned in *Snyder*, it would have punished state and local officials five times more harshly as another statute punished federal

officials for precisely the same conduct.  603 U.S. at 13.  It also would have "authorized the same 10-year maximum sentences for (i) gratuities to state and local officials and (ii) bribes to state and local officials," when bribery otherwise is "treated as a far more serious offense" than providing gratuities.  *Ibid.*

These disparities—which "[t]he Government [could not] explain"— buttressed the Court's preexisting textual reading "that § 666 is a bribery statute" and "not a gratuities statute."  *Snyder*, 603 U.S. at 12-14.  But nowhere did the Court assert that the specter of sentencing disparities alone would authorize courts to distort an unambiguous phrase like "laws of the United States."  18 U.S.C. 241; *contra* Br. 30, 37-38.  Nor did it purport to overrule the "well-established principle that Congress may intentionally prescribe multiple punishments for the same conduct."  *United States v. Stewart*, 65 F.3d 918, 927 (11th Cir. 1995).

*Snyder*'s analysis of the federal bribery statute thus has no impact on whether Congress can impose a different maximum sentence in Section 241 than in the FACE Act for *different* conduct.  To the contrary, the *Snyder* Court considered it a red flag that the

government's reading of the bribery statute would have imposed the *same* maximum sentence for accepting both bribes and gratuities, given that the former is traditionally seen as worse than the latter. 603 U.S. at 13. And to the extent the Court considered cross-statutory sentencing disparities at all, it was only because similarly situated defendants would have received vastly different sentences for the *same* conduct under the government's reading. *Id.* at 13-14.

Here, by contrast, all defendants are exposed to the same, higher maximum sentence for conspiracy conduct under one statute and the same, lower maximum under another for substantive conduct by first-time offenders where no bodily injury or death results. And this distinction is perfectly in keeping with the general view that conspiracies can pose a greater danger to the public than individual completed offenses. *See Jimenez Recio*, 537 U.S. at 275. *Snyder* did not "remake the law to mandate that conspiracies resulting in disparate sentences are now presumptively invalid." Doc. 249, at 8.

In any event, Oropesa's vaunted sentencing disparity between Section 241 and the FACE Act is not nearly as clear-cut as Oropesa suggests. Oropesa would only be subject to misdemeanor penalties

under the FACE Act because this was her "first offense."  18 U.S.C.

248(b)(1).  But as Oropesa acknowledges (Br. 28), the FACE Act

imposes escalating sentences based on the circumstances of the crime.

Had it been her second offense, she would have been committing a

felony under the FACE Act, with a three-year maximum sentence.  *See*

18 U.S.C. 248(b)(2).  Had bodily injury rather than just property

damage resulted from her actions, she would have opened herself up to

the same ten-year statutory maximum sentence as under Section 241.

*See* 18 U.S.C. 248(b).  Had someone died, she could have been

imprisoned for life, *ibid.*, similar to Section 241's maximum of life

imprisonment or death for conspiracies that result in death, *see* 18

U.S.C. 241.  The FACE Act thus does not express a congressional intent

to treat *all* violators as misdemeanants, or consistently to create

significantly lower maximum penalties than Section 241.

Meanwhile, although Section 241 allows for felony convictions,

Oropesa's *actual* conduct here led only to a misdemeanor sentence of

120 days' imprisonment.  Doc. 363, at 2.  Though "the sentencing

discretion of district courts" cannot "substitute for" any "fine-grained

statutory distinctions" in a statute's sentencing maximums, *Fischer*,

603 U.S. at 494 n.2, Oropesa's sentence illustrates that adding Section 241 conspiracy liability does not inherently interfere with the FACE Act's distinctions for conduct related to substantive offenses. Particularly when combined with the FACE Act's express non-exclusivity provision, *see* 18 U.S.C. 248(d)(3), there is no basis to read the FACE Act's own criminal penalties as impliedly prohibiting charges under Section 241.

3. As a last-ditch effort, Oropesa suggests the government only could have prosecuted her under the general federal conspiracy statute, 18 U.S.C. 371, because it limits to misdemeanor penalties any conspiracy to violate a statute that itself creates only a misdemeanor offense. Br. 39. But Section 371 teaches exactly the opposite lesson. Had Congress wished to tether Section 241's penalties to those of the statute creating the underlying federal right, Congress knew how to say so. Section 371 has occupied a prominent place in the Federal Criminal Code since Congress enacted it 87 years ago. *See* Act of June 25, 1948, ch. 645, sec. 371, § 371, 62 Stat. 701 (18 U.S.C. 371). Congress could have amended Section 241 at any time to add Section 371's misdemeanor proviso. It has not. This Court cannot, at Oropesa's

urging, circumvent Congress's decision to impose different penalty regimes for these two conspiracy statutes.

Besides, the two provisions serve different purposes that warrant different treatment. Section 371 punishes conspiracies "to commit *any* offense against the United States." 18 U.S.C. 371 (emphasis added). It thus applies to every conspiracy "to violate a federal statute," of whatever kind. *See United States v. Falcone*, 934 F.2d 1528, 1550 (11th Cir.) (Tjoflat, J., specially concurring), *reh'g granted and opinion vacated*, 939 F.2d 1455 (11th Cir. 1991), *and opinion reinstated on reh'g*, 960 F.2d 988 (11th Cir. 1992) (en banc). Section 241, by contrast, applies only to conspiracies to violate the smaller subset of "laws" that creates a personal "right or privilege." 18 U.S.C. 241.

Section 241's application to a narrower category of conspiracies than Section 371 justified Congress's imposing a different set of penalties. Congress created Section 371's misdemeanor proviso as part of its broader recodification of the Federal Criminal Code. *See* H.R. Rep. No. 304, 80th Cong., 1st Sess. A29 (1947). Congress added the proviso because it thought it unjust, as a general matter, to allow for greater punishment for conspiracies to violate federal statutes than for

the underlying substantive offense.  *See ibid.*  But Congress retained some "special conspiracy provisions" and their preexisting penalty regimes "where the punishment provided in [Section 371] would not be commensurate with the gravity of the offense."  *Ibid.*  Among the retained statutes:  Section 241.  *Ibid.*  Congress thus made a considered decision not to limit Section 241's penalties to those of its underlying rights-creating statutes—and it has not revisited that decision since.

\*      \*      \*

Given the clear statutory text and history, as well as over a century of supporting case law, it is far from "an 'inexplicable anomaly'" (Br. 36 n.17) that Oropesa may be subject to a higher maximum penalty for conspiracy against rights under Section 241 than she might have faced for a substantive FACE Act violation.  Neither *Fischer* nor *Snyder* says otherwise.  Oropesa's indictment and conviction were proper.

## CONCLUSION

For the foregoing reasons, this Court should affirm Oropesa's

conviction.

Respectfully submitted,

GREGORY W. KEHOE
  United States Attorney
  United States Attorney's Office
  Middle District of Florida
  400 N. Tampa Street, Suite 3200
  Tampa, Florida 33602-4798
  (813) 274-6000

HARMEET K. DHILLON
  Assistant Attorney General
MICHAEL E. GATES
  Deputy Assistant Attorney General

s/ Noah B. Bokat-Lindell
JASON LEE
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 598-0243

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Eleventh Circuit Rule 32-4 because it contains 10,444 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date: April 25, 2025